**William Jack HAMMETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 58453.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 28, 1979.

Rehearing Denied April 11, 1979.

Sam H. Bass, Jr., Freeport, Robert Tarrant, Houston, Don R. Irvin, Alvin, for appellant.

Ogden Bass, Dist. Atty. and Doyle W. Neighbours, Asst. Dist. Atty., Angleton, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING

TOM G. DAVIS, Judge.

Our prior opinions are withdrawn and the following opinion is substituted.

Appeal is taken from a conviction for the offense of capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). The jury returned an affirmative finding to each special issue submitted under Article 37.071(d), V.A.C. C.P., and accordingly punishment was assessed at death.

Mrs. Raymond Greer, the widow of the deceased, testified that on the evening of October 14, 1976, her husband returned to their home in Clute from Houston. After the evening meal she was watching TV and he was reading the newspaper. She heard a sound something like a door slamming and thought it was her husband's son, Raymond, Jr., returning. She noticed that the time was approximately 8:20. She then heard two voices. They said, "Get up, get up out of the goddamn chair, get up," over and over again. One of the men was holding a gun. She started to stand up and was thrown to the floor by her husband. She heard someone say immediately after the shooting, "Get his billfold, where is his billfold?" She then heard someone say, "Let's get out of here. Come on, let's go. Let's get out of here."

She also testified that she and her husband had a safe in their home concealed below a floor tile. After the shooting she discovered that the tile had been broken. She thought her husband was still alive and called for help. She positively identified the appellant as the man who shot her husband.

Arthur Pryor, at the time of the offense an investigator for the Clute Police Department, testified that he was called to the Greer home to investigate a possible murder. In the course of his investigation, he found several .45 caliber bullets and spent shell casings. He also located a .22 caliber bullet fragment. Through this witness numerous photographs of the scene of the crime were also introduced into evidence.

Carl Sherlock testified that his former wife's nephew, Curtis McGuffey, sold him a .45 caliber pistol for $50.00 in 1976. After a conversation with his ex-wife, Janette Sherlock, about some "difficulties she had," he called Officer J. L. Nicholson and turned the pistol over to him.

J. L. Nicholson of the Houston Police Department testified that in early 1977 he had a conversation with Carl Sherlock and that as a result of this conversation a .45 caliber pistol was turned over to him by Sherlock. Jay Evans, formerly a detective with the Harris County Sheriff's Office, testified that during January, 1977, he was participating in the investigation of the killing of Raymond Greer in Brazoria County. On January 14, 1977, he received a .45 caliber pistol from Nicholson and turned it over to the Houston "Firearms Ballistics Section."

Dr. Joseph Jachimczyk, Chief Medical Examiner for Harris County and Houston, testified that an autopsy was performed on the body of Raymond Greer on October 15, 1976. Six gunshot wounds were found and one bullet was recovered from the body. He determined the cause of death to be multiple gunshot wounds to the chest, abdomen, back, right upper extremity, and buttocks.

C. E. Anderson, a ballistics expert with the Houston Police Department, testified that the bullet recovered from Greer's body and the bullets found in the Greer home were all fired from the .45 caliber automatic which Nicholson recovered from Sherlock.

Arthur Pryor was re-called and testified outside the presence of the jury as to the circumstances of the taking of appellant's written confession. After hearing additional evidence from the appellant and considering evidence previously offered at a pre-trial motion to suppress hearing, the trial court found the confession admissible. Appellant's confession, omitting the warnings and formal portions, is set out in the appendix. When originally introduced before the jury at the guilt-innocence stage of the trial, certain extraneous matters were deleted. At the punishment phase of the trial the undeleted confession was admitted before the jury.

Janette Sherlock testified for the defense that she had been acquainted with Raymond Greer during his lifetime and intimated that he had been involved in some type of cocaine or narcotics smuggling. She admitted that she had been arrested and charged in connection with the instant offense but had been "no-billed" by the grand jury. She testified that during the time she was held in jail in connection with this offense she suffered a miscarriage. She testified that the appellant was the father of that baby. The appellant did not testify and offered no other evidence at the guilt-innocence stage of the trial.

At the punishment phase of the trial, Richard Tywater, a detective with the Harris County Sheriff's Department, testified as to the circumstances surrounding a second written statement made by the appellant while in his custody in which appellant confessed to this and other crimes. This confession, State's Exhibit 17, was then admitted into evidence. State's Exhibit 17, omitting the warnings and formal parts, is also set out in the appendix.

Dr. Bill W. Henry, an associate professor of psychiatry at the University of Texas School of Medicine in Galveston, testified that he diagnosed the appellant as an anti-social personality type, for which there is no cure or acknowledged treatment.

The State then introduced evidence of a prior conviction for burglary of a habitation in Denton County in December of 1975. The State also introduced evidence of a conviction for driving a motor vehicle without the owner's permission and for breaking and entering a motor vehicle in 1966 and evidence of a conviction for the offense of burglary in 1969. The appellant presented no evidence at the punishment phase of the trial.

In his first ground of error, appellant contends that the trial court erred in permitting the prosecutor to inform the jurors during voir dire examination of the effect of their yes or no answers to the special

issues submitted under Art. 37.071, V.A.C. C.P., at the punishment phase of the trial.

The record reflects that after the sixth juror was selected the appellant filed a motion in limine requesting the court to direct the prosecutor not to inform the prospective jurors of the effect of their yes or no answers to the special issues. The motion in limine was overruled and the court granted appellant a running objection.

In *Burns v. State*, 556 S.W.2d 270 (Tex. Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977), relied on by the appellant, we held that reversible error was not presented when the trial court prohibited counsel for the defendant from telling the jury panel during voir dire examination the effect of a "yes" or "no" answer to the special issues submitted at the punishment stage of the trial. In *Burns v. State*, supra, we stated:

> "In *Hovila v. State*, supra [532 S.W.2d 393 (Tex.Cr.App.1976)], *while noting that the jury would know the effect of their answers to questions submitted under Article 37.071, supra*, it was stated: The 'new statutes' require 'them [the jury] only to answer questions while the judge assesses the punishment based on such answers.'
>
> "Since it is the duty of the jury to answer the factual inquiries and the duty of the court to assess punishment based on these answers, we find no error in the court disallowing counsel to tell the jury panel the effect of their 'yes' and 'no' answers." [Emphasis supplied.]

In *Battie v. State*, 551 S.W.2d 401 (Tex. Cr.App.1977), cert. denied, 434 U.S. 1041, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), we stated:

> "While it has been held that great latitude should be allowed a party interrogating veniremen to enable his counsel to determine the desirability of exercising on the members thereof his right of peremptory challenge, *Kincaid v. State*, 103 Tex.Cr.R. 485, 281 S.W. 855; *Smith v. State*, Tex.Cr.App., 513 S.W.2d 823, it has also been recognized by this Court that the decisions as to the propriety of any questions is left to the discretion of the

trial court and *the only review will be for abuse of that discretion.*" [Emphasis supplied.]

In the instant case, we find that the question of whether the prosecutor in this case or counsel for the defendant, as in *Burns v. State*, supra, should be allowed to explicitly tell the prospective jurors the effects that their answers to the special issues submitted under Art. 37.071 is addressed to the sound discretion of the trial court and a case will not be reversed unless the appellant can demonstrate an abuse of the trial court's discretion. No abuse of discretion is shown in allowing the prosecutor to advise prospective jurors of the effect of their answers when, as we observed in *Hovila*, the jurors would already know the effect. Appellant's first ground of error is overruled.

In his second ground of error, appellant contends that the trial court erred in permitting the prosecutor "to imply to the jurors during voir dire examination that the terms 'intentionally and knowingly' was a 'chance' or 'possibility.'" Although somewhat obscure, it appears to be appellant's contention that the prosecutor erred when attempting to explain to the prospective jurors what he understood the term "probability" to mean in the second special issue submitted under Art. 37.071. In describing the term "probability," the prosecutor on a number of occasions used the term "chance" or "possibility." Appellant refers us only to a series of pages and line numbers without further elaboration.

The records reflects that 41 prospective jurors were examined before a jury was selected. An examination of the citations to the record contained in appellant's brief reveals that he appears to be complaining about the prosecutor's comments to eight veniremen. Of these eight, one was challenged for cause by the State, four were peremptorily challenged by the appellant, and three sat on the jury. Each of the complained-of veniremen who sat on the jury was affirmatively accepted by the appellant at the conclusion of the individual

voir dire. The record further reflects that at the conclusion of the voir dire the appellant had four remaining peremptory challenges and the State had ten. There is no showing that an objectionable juror sat on the jury. The appellant had sufficient remaining peremptory challenges to have removed each juror he now complains of who sat on the panel. See *Payton v. State*, 572 S.W.2d 677 (Tex.Cr.App.1978). No error is shown. Appellant's second ground of error is overruled.

■ The appellant next contends that the trial court erred in allowing a psychiatrist who was appointed to examine the appellant with respect to his competency to stand trial to testify at the punishment phase of the trial. In the same ground or error, appellant also complains that he was denied the appointment of a psychologist of his own choosing to testify as a defense witness.

In *Gholson v. State*, 542 S.W.2d 395 (Tex. Cr.App.1976), cert. denied, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977), this Court held that a psychiatrist appointed to determine a defendant's competency to stand trial could properly testify at the punishment phase of a capital case. See also *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr. App.1978).

With respect to appellant's contention that he was denied the appointment of a psychologist of his choice, the record reflects that a written motion seeking appointment of the psychologist was filed after the conclusion of the jury voir dire on October 14, 1977. The matter was again re-urged during the cross-examination of Dr. Henry.

On original submission this contention formed the basis of a reversal of this cause. Since such opinion was delivered, additional record as hereinafter noted has been brought before this Court. Our further review of the entire record now before us dictates the following disposition of this ground of error.

Prior to appellant filing the motion in which he requested the appointment of a psychologist of his choice at 11:00 a. m. on October 14, 1977, the following events had transpired which we deem relevant to the resolution of the issue before us.

On April 19, 1977, appellant filed his motion for commitment to a mental hospital for psychiatric testing. In such motion, defense counsel avers that he has reason to believe that appellant is afflicted with a form of mental disorder that may have destroyed his ability to perceive the wrongfulness of his conduct and that appellant "appears to be in a state at the present time that prevents him from being able to effectively assist the undersigned attorney in preparing any effective defense."

Pursuant to appellant's motion, the record reflects that an order was entered by the court on April 20, 1977, appointing Dr. B. W. Henry, an associate professor of psychiatry at the University of Texas Medical Branch in Galveston, and directing the sheriff to transport appellant to Dr. Henry's office on April 21, 1977. No objection was voiced by appellant to the appointment of Dr. Henry.

Dr. Henry made two written reports to the trial court, one dated April 24, 1977, and the other dated April 26, 1977. It is not clear from the record before us at what point in time appellant's counsel received copies of these reports, but the record is clear that they were in counsel's possession at the time of Dr. Henry's testimony at appellant's first trial.

In the course of his April 24th report, Dr. Henry states that he telephoned appellant's attorney during his first interview with the appellant in order to obtain his assistance in having the appellant cooperate with the examination. Dr. Henry's report of April 24, 1977, contains the following summation:

"My initial impression of William Jack Hammett, based on my incomplete clinical review with him is that Mr. Hammett has had difficulty with the law for at least eighteen years as a result of his antisocial behavior. In the interview set-

ting he certainly conducts himself with expressions and demeanors consistent with a personality and behavior disorder primarily."

In his report on April 26, 1977, Dr. Henry states, after concluding that appellant was competent to stand trial, that:

"The history would suggest that William Jack Hammett is a person who has possessed personality, behavioral, and characterological attributes which have resulted in repeated antisocial behavior over the past eighteen years. There is a suggestion that on one occasion in 1971 he became quite depressed and was diagnosed as having a schizophrenic reaction following a lengthy period of solitary confinement, including what is described by him as apparent sensory deprivation, which apparently, however, did not then demonstrate any delusions, hallucinations, or psychosis, according to the psychiatric report, which apparently responded shortly to a change of environment with some medication."

Trial began on April 26, 1977, and the jury found appellant guilty of capital murder on May 3, 1977. The punishment hearing began on May 4, 1977, at 9:25 a. m. and the presentment of evidence concluded at 12:05 p. m. the same day. On May 6, 1977, the court entered an order declaring a mistrial which recited, "it was altogether improbable that [they] could agree on a verdict as to special issue number three."

In a supplemental transcript filed with the Court following our opinion on original submission, it was shown that Dr. Henry submitted a bill to the court for "5/4/77 expert testimony one-half day in Angleton." This was the first notice that this Court had that Dr. Henry may have testified at the punishment hearing at the first trial. Pursuant to an order of this Court, a transcription of the testimony of Dr. Henry at the punishment stage of the first trial has been forwarded to this Court. At such trial, Dr. Henry described in detail the tests that he had administered to appellant and his conclusion that, "His mental status revealed no indication of mental disease

processes, but rather a personality structure which would be termed antisocial in type." When asked whether he had an opinion as to the probability of the appellant committing criminal acts of violence in the future, Dr. Henry stated:

"The label attached to the personality or character structure is based on the history of such activities in a given individual. Most frequently the person suffering of an antisocial personality continues to demonstrate those behaviors in the future which have been true in the past. He described to me antisocial behaviors since age eleven, and the description has been of such activities which have led to today. . . . The interview and some of the statements which are on file would suggest that there has been and continues to be such preoccupations with similar kind of behavior and threats made which would make my answer yes to your question."

On August 11, 1977, it appears that the court determined appellant was indigent and the court appointed appellant's retained counsel at the first trial along with a second attorney to represent appellant.

On August 17, 1977, appellant filed a motion for continuance of the trial which had been set for August 22, 1977, and requested that additional counsel be appointed. The motion was granted and trial was reset for October 10, 1977. On August 22, 1977, a third attorney was appointed to represent appellant.

The record reflects a great number of motions were filed by appellant on October 10, 1977, none of which related to the appointment of a psychiatrist or psychologist. On the same day voir dire examination of the jury panel began. The docket sheet reflects the twelfth juror was either accepted or voir dired at 9:09 a. m. on October 14, 1977, and the jury was recessed until 9:30 a. m. "on Monday–10–17–77." (A verdict of guilty was reached on October 19, and trial was concluded on October 20, 1977.) The written motion of the appellant seeking the appointment of a psychologist of his own choice reflects a file mark of the district

clerk at 11:00 a. m. on October 14, 1977. While the motion reflects the notation "Denied" and the signature of the trial judge, it does not reflect when the motion was brought to the court's attention or when the court ruled on the matter.

It is apparent from the written reports of Dr. Henry and his testimony at the punishment hearing of the first trial on May 4, 1977, that Dr. Henry was a witness to matters beyond the scope of Arts. 46.02 or 46.03, V.A.C.C.P. See *Gholson v. State*, supra. The record reflects that Dr. Henry's testimony at the second trial from which this appeal is taken is essentially the same as that at the earlier trial.

■■■ Dr. Henry was appointed pursuant to appellant's motion of April 19, 1977, asking the court for psychiatric testing to determine if appellant knew the wrongfulness of his conduct and to determine his competency to stand trial. No objection was voiced to the appointment of Dr. Henry. Following the mistrial, appellant took no action to ask for the appointment of another psychiatrist or psychologist until after the jury selection had been completed for the second trial on October 14, 1977. In the meantime, a motion for continuance had been filed to the August setting, the request for the appointment of the retained attorney as well as two other attorneys to represent appellant was made and granted during August. Numerous other motions were filed by appellant on October 10, 1977. At no time had there been a request made by appellant pursuant to Art. 26.05(1)(d), V.A.C.C.P., to obtain funds for expert testimony.

Even though appellant had been aware of the nature of Dr. Henry's testimony since May 4, 1977, he waited until after the jury had been selected for the second trial before requesting the appointment of a psychologist and then asked that the court appoint one of his choice.

Appellant in his motion did not suggest a particular psychologist, nor did he make any suggestion about the cost involved; what efforts, if any, he had made in locating a psychologist; or when the psychologist could make the examination or when one could be available to testify at trial following the examination.

We recognize that there is a distinction between the appointment of legal counsel to represent an indigent defendant and the appointment of a psychiatrist or psychologist to examine him which stems from the distinct difference in the professions. Nevertheless, a defendant may not manipulate his rights to either to obstruct the orderly administration of justice. See *Rodriguez v. State*, 530 S.W.2d 944 (Tex.Cr. App.1975); *Estrada v. State*, 406 S.W.2d 448 (Tex.Cr.App.1966). Conceding that appellant should be heard on the question of what expert is to be appointed, the court must have the ultimate control of the appointment.

Without minimizing the desirability of providing an indigent defendant in a capital murder case with the benefit of expert psychiatric testimony, it would be unthinkable for a court to give an indigent defendant an open checkbook to use in selecting the expert of his choice.

Not only was the late hour in which appellant filed his motion calculated to be disruptive of the trial, the very nature of his motion compounded this problem. To have granted appellant's motion as it was presented and at the time it was filed would have constituted a real threat to the court's control of the trial. The granting of appellant's motion under the circumstances here presented would have allowed appellant to manipulate his asserted rights in such a manner as to obstruct the orderly administration of justice. We cannot agree that the court erred in denying appellant's motion.

Appellant's third ground of error is overruled.

■■■ In his fourth ground of error, appellant contends that the trial court erred in overruling his motion to quash the indictment.

The indictment in the instant case alleges in pertinent part that on or about October 14, 1976, the appellant:

"did then and there intentionally and knowingly cause the death of an individual, Raymond V. Greer, by shooting him with a gun; and that the said William Jack Hammett did then and there intentionally cause the death of the said Raymond V. Greer in the course of committing and attempting to commit robbery; . . .."

In his motion to quash and on appeal, the appellant contends that the indictment was deficient because it did not set forth the constituent elements of the offense of robbery. The appellant specifically argues that:

"There is no allegation of committing or attempting to commit a theft."

In *Smith v. State*, 540 S.W.2d 693 (Tex. Cr.App.1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977), this Court held that a capital murder indictment is not defective because the elements of robbery are not set out in the indictment charging murder during the commission or attempted commission of a robbery. Under the new Penal Code, an indictment charging one offense during the commission of another crime need not allege the elements of the latter offense. See *Gonzales v. State*, 517 S.W.2d 785 (Tex.Cr.App.1975); *Watts v. State*, 516 S.W.2d 414 (Tex.Cr.App.1974).

In addition to *Smith v. State*, supra, this contention has been rejected in other capital murder cases. *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977).

Appellant's fourth ground of error is overruled.

In his fifth ground of error, appellant contends that the trial court erred "in permitting all of the evidence, State's Exhibit 1–17, because the State failed to prove the complete chain of custody of said evidence." The appellant argues that each of these exhibits was handed to the court reporter for the purpose of marking the exhibit with a number prior to its introduc-

tion into evidence and that therefore, "a part of the chain of custody of each and every exhibit is in the hands of the court reporter for a period of time. . . . ." Appellant's brief contains no citation of authority with respect to this contention.

In examining the record in the instant case, we note that State's Exhibit No. 1 is a diagram, State's Exhibit No. 2 is a .45 caliber pistol; State's Exhibits 3–13, photographs; State's Exhibits 14 and 15, spent bullet casings; and State's Exhibits 16 and 17 are written statements of the accused. Even assuming an objection was made to each of the items on the grounds now urged, it is clear that a chain of custody question was not involved. As a well-known text on evidence has observed:

"If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation." McCormick's Handbook on the Law of Evidence, 527 (2d ed., E. Cleary ed. 1972); see also 2 C. McCormick and R. Ray, Texas Law of Evidence, Sec. 1458 (2d ed., 1956).

An examination of the testimony given at the time each of the exhibits was admitted into evidence reveals that each was sufficiently identified. Appellant's contention that it was necessary for the court reporter to testify as to her custody of the items during the time she marked it is without merit.

Appellant's ground of error is overruled.

In his sixth ground of error, appellant contends that the trial court erred in admitting State's Exhibit Number 17 at the punishment phase of the trial. State's Exhibit

Number 17 is a written confession made by the appellant to Detective Richard Tywater of the Harris County Sheriff's Department. In this confession, the appellant confessed to the murder and robbery of Greer and admitted that he was a heroin addict, had committed approximately 130 burglaries, stolen 30 cars, and committed three or four armed robberies. The appellant argues that this statement should not be admissible at the punishment phase of a capital murder trial because it was "not pertinent to any issue in this case; . . . [and that it] could only be used for the purpose of inflaming the minds of the jurors." The appellant also argues that this statement was not admissible under the "extraneous offense rule." We disagree.

Article 37.071, V.A.C.C.P., provides that at the punishment phase of a capital murder trial, "Evidence may be presented *as to any matter* that the court deems relevant to sentence." [Emphasis added.] In construing this provision in *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), aff'd., 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), we stated:

> "In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. *It could consider the range and severity of his prior criminal conduct. . . .* " [Emphasis added.]

The trial court at the punishment phase of a capital murder trial has wide discretion in admitting or excluding evidence. See *Gholson and Ross v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976), cert. denied, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr. App.1976), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977); *Brown v. State*, 554 S.W.2d 677 (Tex.Cr. App.1977); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978), cert. denied, —— U.S.

——, 99 S.Ct. 1058, 58 L.Ed.2d 97 (1979); *Wilder v. State* (No. 57,848, 1–31–79).

In upholding the constitutionality of the Texas death penalty procedures, the United States Supreme Court noted:

> "Texas law requires that if a defendant has been convicted of a capital offense, the trial court must conduct a separate sentencing proceeding before the same jury that tried the issue of guilt. Any relevant evidence may be introduced at this proceeding . . . . The Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death. . . . *What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.* Texas law clearly assures that all such evidence will be adduced." [Emphasis added.]

*Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Nothing in Art. 37.071, supra, requires that there be a final conviction for an extraneous offense to be admissible at the punishment phase of the trial. Evidence of other crimes contained in appellant's confession to Detective Tywater clearly falls within the range of "prior criminal conduct." Such "prior criminal conduct" is clearly relevant to the jury's deliberation on the special issues submitted to it at the punishment phase of a capital murder trial. Appellant's admission of his "prior criminal conduct" is probative evidence that may be brought before a jury at the punishment phase of a capital murder trial. The trial court did not err in admitting State's Exhibit Number 17. Appellant's sixth ground of error is overruled.

In ground of error number seven, appellant contends that the trial court erred in admitting State's Exhibits 3 through 13 because they were not properly identified. The record reflects that State's Exhibits 3 through 13 consist of photographs of the scene of the crime. They were admitted

through the testimony of Arthur Pryor, who at the time of the offense, was an investigator with the Clute Police Department. Appellant contends that since Pryor never testified that he was the one who took the pictures, they were inadmissible.

The record reflects that Pryor testified that each of the photographs fairly and accurately portrayed the scene at the time of his investigation.

In *David v. State*, 453 S.W.2d 172 (Tex. Cr.App.1970), this Court, quoting from C. McCormick & R. Ray, Texas Law of Evidence, Sec. 1465, 2d ed., 1956, stated:

" 'Whenever a photograph portrays any facts relevant to an issue in the case it is admissible in evidence provided it is first verified by a witness as being a correct representation of such fact.

" 'This verifying witness need not be the photographer nor need he have any knowledge concerning the taking of the picture. What is essential is that he knows the scene or object involved and be able to state that the photograph correctly represents the facts. . . .' "

See *Lanham v. State*, 474 S.W.2d 197 (Tex.Cr.App.1972); *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972); *Villarreal v. State*, 547 S.W.2d 281 (Tex.Cr.App.1977); see also McCormick's Handbook on the Law of Evidence, Section 214 (E. Cleary ed. 1972).

It is clear that the photographs were properly verified by the witness as accurately portraying the depicted scene. Appellant's contention that they were inadmissible because the photographer did not testify is without merit.

▆ In his eighth ground of error, appellant contends that the trial court erred in admitting into evidence State's Exhibits 19, 20, and 21 at the punishment phase of the trial. State's Exhibit Number 19 consists of a penitentiary packet from the Texas Department of Corrections containing a judgment, sentence, and order of commitment in Cause No. 11,965, wherein the appellant was convicted of the offense of driving a motor vehicle without the owner's permission, and a conviction in Cause No. 11,966, wherein appellant was convicted of burglary of an automobile. In addition, the pen packet contains the fingerprints and photographs of a William Jack Hammett. State's Exhibit Number 20 is also a penitentiary packet from the Texas Department of Corrections containing a judgment, sentence, and order of commitment in Cause No. 12,518, wherein William Jack Hammett was convicted of the offense of burglary in Denton County in 1969. The penitentiary packet also contains fingerprints and photographs. State's Exhibit No. 21 consists of the Brazoria County Jail fingerprint card maintained on William Jack Hammett.

Paul R. Wishman, a Brazoria County deputy sheriff, was qualified as a fingerprint expert. Outside the presence of the jury, the trial court ordered the fingerprints of the appellant to be taken by Wishman. The appellant refused the court's order and would not allow his fingerprints to be taken. After returning to the courtroom, State's Exhibit No. 21 was identified as a fingerprint card used in the identification section of the Brazoria County Sheriff's office. The witness testified that he had personal custody of the fingerprint card and that it was kept in the usual course of business in the Sheriff's office. Wishman testified that the fingerprint card revealed that the fingerprints of William Jack Hammett were taken by Captain Judy Roex and that these cards were made on each person as he was booked into jail. Wishman identified the appellant as William Jack Hammett. Wishman also testified that the fingerprints on State's Exhibit Number 21 were the same as the fingerprints contained in State's Exhibits Nos. 19 and 20.

Appellant contends that since Wishman did not personally take the fingerprints in State's Exhibit No. 21 they were hearsay and that therefore both State's Exhibit 21 and the pen packets in State's Exhibits 19 and 20 should not have been admitted. In *Jones v. State*, 500 S.W.2d 661 (Tex.Cr.App. 1973), this Court held that a fingerprint expert could properly compare defendant's fingerprints taken from "an original jail

card" made up when a named person was incarcerated in the county jail and compare those prints with other records to prove up the admissibility of other final convictions. The Court specifically noted that it was not necessary for the fingerprint expert to have made the known prints himself to authenticate them. See also *Tatum v. State*, 505 S.W.2d 548 (Tex.Cr.App.1974); *Bullard v. State*, 548 S.W.2d 13 (Tex.Cr.App.1977).

The State sufficiently proved that the appellant was the same William Jack Hammett whose prior convictions were reflected in State's Exhibits 19 and 20. Appellant's eighth ground of error is overruled.

■ In his ninth ground of error, appellant contends that the trial court erred in admitting State's Exhibit No. 2, a .45 caliber pistol, because a "complete chain of custody had not been proved." Appellant's contention is grounded on the fact that Carl Sherlock could not positively identify State's Exhibit No. 2 as being the same pistol he received from Curtis McGuffey in 1976. When asked if he could identify State's Exhibit No. 2, Sherlock testified, "Well, it looks like it but I have no way of knowing. I mean I never did mark the gun or nothing." J. L. Nicholson of the Houston Police Department testified that State's Exhibit No. 2 was the pistol he received from Carl Sherlock. He noted that at the time he received the weapon he scratched the initials "J.L.N." on the weapon and that State's Exhibit No. 2 contained this marking. The record also reflects that C. E. Anderson, a ballistics expert, testified that a bullet found in the deceased's body matched a bullet fired from State's Exhibit No. 2. On the basis of these facts, we find that State's Exhibit No. 2 was sufficiently identified. Appellant's ninth ground of error is overruled.

■ In his tenth ground of error, appellant contends that his written confession, State's Exhibit No. 16, given to Officer Pryor, was involuntary.

The appellant argues in his brief that his confession was involuntary as a matter of law because he "was led to believe that his girl friend would be set free if he gave a statement. That such a belief, from these facts, shows that the confession by the defendant was made with compulsion and persuasion so as to get his girl friend set free from jail and from the capital murder charge at a time when she was in dire need of medical assistance due to her miscarriage while in jail."

The record reflects the following events surrounding the taking of appellant's written confession, State's Exhibit Number 16. The appellant was apparently arrested in Robertson County on January 19, 1977. On January 20, 1977, law enforcement personnel from Clute traveled to Robertson County and attempted to interview the appellant after he was advised of his rights by Lieutenant Argo and had been taken before a magistrate in Robertson County. Later that day, appellant was transferred from the Robertson County Jail to the Brazos County Jail. Late in the evening of January 22, the appellant was transferred from the Brazos County Jail to Brazoria County. On Sunday, January 23, he was again advised of his rights by a magistrate in Brazoria County. On Tuesday, January 25, a meeting took place between the appellant and the Brazoria County district attorney. The next day the appellant's girl friend, Janette Sherlock, and her attorney, Louis Andrews, met with the Brazoria County district attorney at Andrews' request. At this time, Sherlock was being held without bond on a charge of capital murder in connection with the instant offense. After evaluating the case with her counsel, the prosecutor agreed to set bond in the amount of $2,500 on the condition that Sherlock give a written statement to the authorities with respect to the instant offense. The record is unclear as to whether a statement was ever given by Sherlock. Although there is a conflict in the testimony, apparently at the request of Sherlock, the district attorney agreed to allow her to meet with the appellant. Sherlock and Andrews then met with the appellant at the Brazoria County Jail in a conference room. The appellant was advised by Sherlock as to her current medical condition since she has

recently suffered a miscarriage. She also advised the appellant that she was being released on bond. According to Andrews, there was no discussion of any "deal" that the appellant would make a written statement in exchange for Sherlock's release on bond.

Sherlock and the appellant both testified that Sherlock's release on bond was in exchange for the appellant giving the authorities a written confession as to his participation in the robbery and murder of Raymond Greer. The prosecutor emphatically denied any such agreement and was supported by the testimony of Louis Andrews, Sherlock's attorney, who was also present. Later that afternoon and early in the evening, the appellant gave a detailed written statement, which was admitted as State's Exhibit Number 16. It is undisputed that the proper warnings and formalities required by Art. 38.22, V.A.C.C.P., and the United States Constitution were fully complied with. Appellant's only contention is that the confession was not voluntary because it was improperly induced by the alleged "deal" with respect to Sherlock's release on bond. On the basis of the conflicting evidence, the trial court found, and we find, that the evidence supports the court's finding that the confession was freely and voluntarily given. See *Roberts v. State*, 545 S.W.2d 157 (Tex.Cr.App.1977); cf. *United States v. Robertson*, 582 F.2d 1356 (5th Cir., 1978) (en banc).

Appellant's tenth ground of error is overruled.

■ In his eleventh ground of error, appellant contends that the trial court erred in overruling his objection to the argument of the prosecuting attorney when he allegedly testified to matters outside the record.

The record reflects the following argument occurred at the guilt-innocence stage of the trial:

"MR. OGDEN BASS: . . . Now another old trick that I have seen around, and I guess if I was on the other side I would do it too because we are adversaries. You get a witness and you try to make a point. 'Well, now, those boat parts, have you got any receipts? A Yes, I think so. Q You got some receipts? A Yes, I think so. Q Well, go down at the noon recess,' sometime 'and bring them back.' Okay, that leaves in the mind she is going to go get them and bring them back. Doesn't it leave that in your mind? It also leaves in my mind if she brings them back he is going to put her on the stand. He asked the question. He asked her to do it. Put her on the stand and ask about them, if she don't bring them back. You know darn well she is going to. But, you know, she went there and she brought them back."

The appellant objected on the grounds that the prosecutor was testifying to matters outside the record. His objection was overruled and his motion for mistrial was denied.

The record reflects the following occurred during the cross-examination of Mrs. Raymond Greer:

"BY MR. SAM BASS [defense counsel]:

"Q   Were you there when they were delivered?

"A   Yes. I got the receipts for them.

"Q   Were you there when they were delivered?

"A   I don't recall if I was in my office or out in the yard when they were delivered, but I was around there somewhere.

"Q   Who brought those parts down there?

"A   I don't recall the name.

"Q   What is the name of the company?

"A   I don't recall the name.

"Q   What is the name of the man?

"A   I don't recall the name.

"Q   What is the name? Can you find it out when you leave here at recess?

"A   There are receipts in the office. Of course I can.

"Q   You can find out and bring us receipts showing when they brought the boat parts, what kind, and who delivered them?

"A Yes.

"Q Could you do that at the noon recess?

"A Of course I can do that.

"Q I would appreciate it if you would.
. . ."

The record reflects the following during the appellant's opening argument at the guilt-innocence phase of the trial:

"MR. TARRANT [defense counsel]: Under our system I am going to sit down now and I don't get to talk to you any more, but before I sit down I would like to say something about one person and that is the testimony of Mrs. Greer. That delivery that was supposed to come out there that night was with some dope. Did you hear anybody put her on the witness stand to substantiate there was boat parts delivered? Did you see any evidence that that boat parts delivery actually happened at all? No, you didn't hear anything like that."

It is clear from appellant's cross-examination of the witness Greer and his opening argument that the complained-of argument by the State was both a reasonable deduction from the evidence and invited by the argument of appellant. *Antwine v. State*, 572 S.W.2d 541 (Tex.Cr.App.1978); *Laws v. State*, 533 S.W.2d 6 (Tex.Cr.App.1976); *Mayberry v. State*, 532 S.W.2d 80 (Tex.Cr. App.1976).

Appellant's eleventh ground of error is overruled.

■ In his twelfth ground of error, appellant contends that the trial court's charge at the guilt-innocence phase of the trial was fundamentally defective because the court charged "intentionally *or* knowingly" while the indictment reads "intentionally *and* knowingly."

In *Cowan v. State*, 562 S.W.2d 236 (Tex. Cr.App.1978), this Court rejected a similar contention in the face of a specific objection to the use of the word "or" instead of the word "and" between the word "intentionally" and the word "knowingly" in the charge. See also *Mott v. State*, 543 S.W.2d 623 (Tex.Cr.App.1976); *Moreno v. State*,

541 S.W.2d 170 (Tex.Cr.App.1976); *Garcia v. State*, 537 S.W.2d 930 (Tex.Cr.App.1976); *McElroy v. State*, 528 S.W.2d 831 (Tex.Cr. App.1975).

Appellant's twelfth ground of error is overruled.

■ In his thirteenth and final ground of error, appellant contends that the capital murder provisions of the Texas Penal Code are unconstitutional because the caption to House Bill No. 200, "An act relating to the punishment for murder under certain circumstances and conditions," was violative of Art. 3, Sec. 35, of the Texas Constitution.

This precise contention has been previously rejected by this Court. *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977).

Appellant's thirteenth ground of error is overruled.

The State's motion for rehearing is granted, and the judgment is affirmed.

## APPENDIX

### STATE'S EXHIBIT # 16

"I have known James Richardson since about May or June of last year. I met him at a friend's house. I don't remember the friend's name.

"I met Curtis McGuffey in June or July of last year. I met him at a friend's house. The friend's name is Jimmy D. Smith.

"I met Janette Sherlock at Jimmy D. Smith's house in September of last year.

"Me and Richardson went to Las Vegas and barred out there about a week, and then went on to Los Angeles and did a hijacking out there and made some money and came back to Texas. Me and Richardson and McGuffey did three or four hijackings in Harris County.

"Richardson doesn't do drugs, but me and McGuffey do. McGuffey does THC and I do heroin. We did these hijackings to get money to by drugs and live on.

"We were on a hijacking on October 14, 1976, at about one or two in the afternoon. We remembered this guy and his son who have an upholstery shop on Warner. We bought some tape at a TG&Y store on Cavalcade in Houston. It was black electrical tape. We were going to tie the guy up with it. We didn't get but four dollars off him. We took Curtis home to Janette's house on Bissonett, and then we went to a jewelry store to case it.

"Then we came back to Janette's apartment to get Curtis and to show him the jewelry store on Lawnpoint. Curtis didn't like it. He got to telling us about Raymond Greer. He said that Mary had told him that Raymond had four pounds of coke and twenty-five thousand dollars in cash at his house. She was Raymond's chip or mistress. Curtis was her ex-husband and he also chipped with her, too.

"I asked him where Raymond lived. He said he didn't know, but it was in the phone book. I said alright, and we went back to Janette's apartment at about five or six o'clock.

"Me and Janette and Curtiss and Richardson and Cindy, Curtis's wife were there at the apartment. While we were thre, me and Curtiss went to the bathroom or to their kids' room and discussed it. About an hour before dark, we told Janette we were going to Goofy's Pool Hall. We left in a stolen car. I had dope on me. I had a fix before we left. Janette lives in a complex of about five hundred units and the car we left in was parked close to it. The car was a 1974 Mercury Marquis, red with white upholstery and bucket seats. I had stolen it off the Dodge House on the Southwest Freeway.

"McGuffey drove, I sat on the right hand driver's side and Richardson was in the back. I had the guns with me. One was a .45 Colt automatic and the other one was a .32 Beretta automatic. I had traded dope for both of them. I had only had them about a week, no longer than that. I had them locked in the glove box in the car. I didn't hand Richardson a gun until we got to Clute. We got on the Southwest Free-way to 288, took a right and headed that way. We stopped at a liquor store that was pink on the outside and had a large gravel parking lot. I don't remember the name of the liquor store. McGuffey got out and went in the liquor store and asked someone where Clute was. He came back outside and got in the car and said that Clute was on the other side of Angleton.

"We stopped at a convenience store. I can't describe it, but it was on the the the [sic] driver's side of the road. We asked where Plantation Road was. Then we went on down 288, past Plantation Road to a cafe with a supermarket on the right hand side of it. McGuffey used the telephone there in front of the supermarket to call Raymond's house to see if he was there. Raymond wasn't there, and a woman had answered the phone. We went to the cafe by the supermarket and ate a hamburger and had a coke, and I went into the restroom and fixed some more heroin.

"Then we went to Raymond's house. McGuffey drove us there and let us out on the corner. There were four cars parked in the front. To the left was a bunch of little trailers and his office. To the right was a building and an alley, and a bar. Me and Richardson walked around to the wrecking yard. No, that's not right, first McGuffey drove us down to a convenience store on the Corner of Plantation Road and 288. From there, me and Richardson walked down the street to the wrecking yard. I walked around the house and jumped over the fence, no, I opened the gate on the fence and walked into the yard. I could see into the house by looking over a swimming pool and through plate glass windows. I could see at least four people in the house, maybe more. I think there were maybe two men and two women, I'm not really sure.

"I decided there were too many people there at that time, and we walked back down to 288. I don't remember what all Richardson and I talked about while we were walking back to the convenience store, but I do remember saying that there were too many people there now, or something to that effect. We decided to kill some time.

"We drove to a bar on Plantation on the corner from Greer's. I don't remember the name of the bar, but it was little and dinky, and was facing Plantation. McGuffey and Richardson got out and went into the bar to drink some beer and shoot pool. I went down to case Greer's house. I was gone approximately fifteen minutes. I walked around his house and opened the gate in the fence and looked in and saw just a man and a woman sitting in a chair looking at television.

"I went back and told them there were just two people at the house, and that two of the cars were gone. Then I told them, 'Let's go get them.'

"We drove to the bar beside Raymond's house, I don't know what the bar looked like. It was a frame building, I believe. I told Curtiss to go in the bar for a drink and to leave the keys in the ignition, and that when we came back, we would honk the horn. I don't know what time this was, but it was after dark.

"I had given Richardson the gun at the convenience store. After I told Curtiss to go get a beer, I said, 'Let's do it.' I had the .45 and Richardson had the .32 which I had given him.

"Our original plan was to knock on the door and to tell whoever answered it, that we needed a wrecker, that our car was in the ditch, or something. I knew that if we could get them to open the door, we would have an easier entry. But when We tried to open the door, it was unlocked. I went in the door first. I knew where Greer and his wife were, because I had seen them through the window when I was there before. They were sitting with their back to us in a big black chair. He was sitting to the right side of the chair with his arm around his wife.

"I ran in first and ran in front of him to the left side of him. Richardson was directly behind him. We both had guns on him. I told him, 'On the floor, m_____ f_____.'

"His wife screamed. Greer said, 'What is this, man?' I said, 'This is a robbery, man.' He said, 'What?' I said, 'It's robbery, get on the floor.' I may have said this a couple of times. Greer's wife was screaming and fell to the floor.

"Richardson kicked the back of Greer's chair real hard with his knees. When he did that, Greer came up with a pistol. It was a revolver. I thought at the time that it was a .38, but I heard later that it was a .22. It had black and white bone handles. He came up and fired a shot at me from the distance of approximately five feet. When I saw the gun come up, I fell directly back on to the couch. I heard the shot fired. I don't know if Greer shot first or Richardson, one of them shot. I heard only one shot. I thought he had shot me and that I just couldn't feel it, and so I shot him six times. I think I had seven bullets in the gun, but I know I shot him six times from the distance of about six or seven feet. I fired four of the shots from the couch and then I stood up. Greer was slumped down in the chair. His face was in the chair and his body was in the floor. This was after I had shot him four or five times. I believe I shot him three times while I was standing over him.

"By this time, Greer was laying on the floor. I was going to choke him. I reached down for his throat and Richardson grabbed me. I reached for a gold chain that Greer had around his neck. I dropped the .45 when I went down to choke him with both hands. Richardson grabbed me and said, 'Come on man, let's go.' I started to reach for his gun and drew back and then reached and drew back again. And then I reached and got my gun. Greer was laying flat on the floor, face up, diagonally to the chair. His wife was on the floor directly behind me. I thought about shooting her. I don't know why I didn't. It wasn't because I was afraid of her or anything. I felt like I needed to get out of there. I don't think she saw me. When I last saw her, she was laying face down on the floor. She was screaming and moaning. I don't know why I didn't shoot her.

"Richardson was gone and I started toward the door. I went halfway to the door and turned and went back. She was crawl-

ing toward Greer and moaning. I didn't say anything to her. I thought of shooting her but blew it off. I closed the door behind me and ran through the gate in the front yard.

"Richardson was sitting in the back seat of the car on the passenger side, when I got there. I got into the front of the car on the driver's side. I honked the horn five or six times before Curtis came out. He got into the car in the front on the passenger's side.

"I drove down to the corner first and took a left and then took another left at the next street. It was a dead end and I took another left and then right onto Plantation Road. Then left onto 288 and went toward Angleton. We did not stop, and went on toward Alvin. About two miles south of Alvin, we took a road to the left. I thought I was taking a short cut, but we ended up in Rosharon and back onto 288.

"The guns didn't change hands during this time. Mine was under the front seat. I don't know where Richardson's was. I told Curtis that we had to kill Greer, that he had come up firing and we had to shoot him. I told him not to tell anyone about this. I told them we had to keep cool, and not get busted.

"I was plotting on both of them right then, but I wasn't going to waste them right then because too many people had seen us leaving the apartment together. Richardson and McGuffey were real sick. We went back to Houston and stopped at a Texaco station at the intersection of 288 and 610. I got five dollars worth of gas and paid cash for it. We all got out and went to the bathroom. Richardson was real sick and had to throw up. We got back into the car and went to Jannette's house.

"Janette wasn't there when we got there. There was just me and Curtis and Richardson and Cindy and another girl named Kim. The kids were with Jannette. She had to take her ex-husband home because he was drunk or something. We were there about an hour or an hour and a half before she got back.

"I had blood all over my hands and clothes. I took a shower and washed real good to get the blood off. I changed my clothes. I told Cindy that we had to kill Greer. She didn't cry or nothing, but she wasn't too happy about it. I told her not to say anything about it.

"She put my bloody clothes in a plastic bag, the clear sandwich baggy type, and I think I tied up the end of the bag with a wire garbage type tier [sic]. Then she took the clothes in the bag and went to another apartment complex and threw the clothes into a dumpster.

"This was before Jannette came home. Then she came home with the two kids and I called her into a back room and told her that I had to kill a man tonight. She said, 'What is his name?' I told her it was Raymond Greer. She got real upset about it. She was worried about me. I told her everything that happened, how it went down.

"McGuffey and Cindy took Richardson home. I believe Kim went with them.

"I had got the gun from Richardson while we were still in the car. I took them into the house and put them some water in the sink to get the fingerprints off them, put them in a plastic bag, and put them under the bed in Jannette's bedroom.

"Then everybody came back and spent the night except for Richardson. The next morning we got up and I got the guns and told them I was going to throw them away (everybody except Kay and the two boys). Curtis said he knew of a good place to get rid of a gun. I gave him the .45 and I kept the .32.

"I left by myself and drove on highway 59 almost to Porter. I stopped at a bridge at a river. I threw the gun on the East side, or on the Houston side, of the river. I threw it into the water about thirty yards from the bank. The gun was still wrapped in the plastic bag, and I can show you where I threw it.

"I went back to the apartment, and I think the same people were still there. I got rid of the car that night at a place over

there off of Cavalcade, not too far from where I pulled the armed robbery. I pulled the tires off of it, but I left the original plates on it.

"I have been doing heroin since last March. At that time I had about a two hundred dollar a day habit. I was supporting it by burglaries and car thefts. I would get rid of the stuff through a fence.

"The girls were going back to Louisiana, and I told them that if anybody said anything about what had happened, that me or Kenny Green would take care of them. I was planning on wasting McGuffey, and told Janette about it. She started crying and said that she had raised him, and please don't do it. I was also planning on wasting Richardson, but he was arrested and put in the Harris County Rehab. I had asked him about twenty times if he had got rid of the .45. He told me that he had thrown it in a pond. Then finally, he told me that he had sold it to Janette's ex-husband, Red.

"The night before Curtis got busted, I was real messed up. This was into the night and Curtis was on THC. Some people came in and told me that Janette was in for Capital Murder, and that Red had Curtis' gun. I asked Curtis if he had sold the gun to Red, and he said, 'Yeah.' When he said that, I hit him in the eye. I started going for my pistol (a 9 mm Browning). Some people grabbed me, and were telling me not to kill him. They got me out of there and we left.

"I went over to Kenny Green's house on Tuesday, January 18, 1977, and he told me that the Texas Rangers and Police Department had been there the night before, hunting for me for Capital Murder.

"Kenny Green is married to my first cousin, Judy Green.

"I had gone over to their house to score some heroin. He had about two or three ounces of heroin and then asked me if I wanted to go to Hearn with him. He said he knew these two girls who were living with this trick who had two hundred thousand dollars and would buy all the dope you wanted. He took me there and left me. I spent the night and left the next day."

"My full name is WILLIAM JACK HAMMETT and I am a white male, 29 years of age. My date of birth 6–7–47. My home address is 5500 Antonie # 155 and I live there with Jeannette Sherlock. My phone number there is 686–1364. I am presently unemployed.

"I met Curtis McGuffie at a Friend by the name of Jimmy D. Smith who lives at the address on Sunny side in June of 1976. I met James Alton Richardson about the same time.

"I began this criminal episode in April of 1976, which consisted of car theft, burglary, armed robbery, and ended with a murder in Bazoria [sic] County. I am a heroin addict and between April of 1976 and January, 1977 I committed approximately 130 burglaries and stole approximately 30 cars. I committed three armed robberies, one aggravated robbery and committed one murder to support my habit, my herion [sic] habit.

"The reason I am making this statement is to clear everything because I feel that if i [sic] cooperate it would go easier with me and to get the pressure off my mind and to make things easier for me.

"In March 1976, I came from San Deigo [sic] California to Houston, Texas and moved in with Kenny Green who resided at 115 Havner. While living with Kenny Green, who is a herion [sic] addict I began to use herion [sic] and developed a habit. In April 1976 I came [sic] dependent upon heroin and did not have the money to support my habit which at this time I was shooting 3 to 4 papers a day, about $150.00 a day habit. I pulled approximately 7 or 8 burglaries in April and stole approximately 3 cars. At this time I was working strickly [sic] by myself. As my habit became stronger, I began to steal more. In May 1976 I committed several burglaries and several car thefts. I don't know how many. I worked mostly in North Harris County and the Northern part of the city. I usually gained entry through a back window or a

back door which ever was easier. I mostly stole color TV's, buns, silver ware, meat, jewerly [sic], and cash. Anything of value that I could sell to a fence or trade for heroin.

"In June 1976 I met Curtis McGuffie. At first McGuffie only set people up for me to burglaries [sic] their homes. He set several of his friends up for me and helped me dispose of a lot of the merchandise. After setting up several burglaries for me he asked me if I needed anyone to help me. I told him yes and then him and I began to commit burglaries. We mostly worked out of North Harris County. He helped me steal several cars in the month of June. We would ride around in the country until we saw a house that looked like no one was home. McGuffie would always go to the door and knock to see if anyone was there. If no one was there, we would park our car down the street or in the next block and walk back to the house and make entry through the back. Then One of us would go back for the car, then he would back into the drive way and we would load the car. I meant to say that we would pile up the merchandise at the front door or the garage. We continued to pull these burglaries and steal these cars on up unitl [sic] the month of July. One day we were out burglarizing, and we stopped at a cafe to eat lunch in Porter Texas. I believe the name of the place was Bill's Steak house and Bar BQ. It is a frame building. There is a trailer house where the owner and manager lives right next door. While we were eating, I made the statement out loud, 'I wonder what he does with the money at night'. We discussed this and decided to come back that night which was July 16, 1976 and watched to see what he did with the money. After all the customers had left we watched (i [sic] mean) we snuck up to the window and watched the manager count the money and put it in a brief case which we could see already had money in it from the previous nights receipts. We deceided [sic] to go back the next night and robb [sic] him. On July 17, 1976, me and Curtis McGuffie, went back to the Steak house to rob him.

We parked our car which was a hot car. We parked across the street in the woods. We walked across the street in a field and waited until everyone of the customers had left. I went to the window and watched him count his receipts. Then we watched him and a woman and a man about 17 years old and a little girl about five years old go into the trailer house with the brief case. Curtis then went to the door and knocked, the owner opened the door and Curtis asked him if he remembered him. The man said no and Curtis told him that he had run out of gas down the street and would he carry him to get some. I was hidding [sic] out of site [sic] beside the trailer with a sawed off, Ithica shot gun. I came out of hiding and ran up the steps with the shot gun and Curtis pulled out his pistol which I believed was a 357 magnum and I hollared [sic] everybody on the floor. The little girl began to scream and I told her to get on the floor that I wasn't going to hurt her. Everyone got on the floor and McGuffie kept them covered with the gun while I taped their hands. I ran out of tape so I cut some lamp cords and tied the feet, with these. I tied everyone up except the little girl. I asked the owner where his money was and he said in my billfold. I got his billfold and there was approximately $150.00 cash in it. I asked him (I mean I told him) the real money, the brief case. Curtis told him that he would Blow his head off if he didn't tell us. He told us the brief case was in the hall closet. I looked in the closet and found the brief case. McGuffie kept telling them that he was going to waste them if any body tried anything and I kept telling them no one would get hurt if they did what we asked. As we started to leave I started to take a ring off the owners finger and he told me that it belonged to his father and grandfather and please don't take it becasue [sic] it meant a lot to him and I told him okay that I understood, that I had a lot of things that I would not part with either so we left, got into our car and went back to Houston. We got approximately $3800.00, my part was $2100.00. With my money I bought a half ounce of heroin which cost

$400.00. I bought probably $400.00 worth clothing for myself and approximately $400.00 of clothing for my girlfriend. The rest I bought dope with. Four days later I was broke again and began, to steal again. I also understand at about this time McGuffie was broke again too. I kept on stealing up until the middle of August and at this time went to Denton County to kick my dope habit. I was gone approximately one month and then came back to Houston.

"I met Jimmy Richardson again at this time and started pulling burglaries with him. I also stole cars with him, for two weeks I worked with Richardson and then went to Las Vegas partying, then we went to California (los Angles [sic]) and committed armed robery [sic] in Orange county. We came back to Houston around the first of October and pulled a few more burglaries together.

"I met McGuffie again at this time, and me and him and Richardson began to work together. On October 14, 1976 we went to Clute Texas (Barozia [sic] County) to pull a robbery and killed a man while committing this robbery. Richardson was arrested three days later and sent to the rehab so me and McGuffie began to work together. We pulled numerous burglaries on up until November. At the end of October, about the 21st me and McGuffie were committing burglaries on Frick Road. We left our car parked and climbed over a fence. The car we used was a 75 or 76 Ford Elite, blue with white vynil [sic] top. I stole this car from Charlie Hall Ford (I believe) on Little York. Some construction men saw us burglarizing the house on Frick Road. When we came out of the addition we saw all the men gathering around our car. We split up, I began walking away from the car and McGuffie began walking toward the car. A man pulled up beside me and stopped the car and pulled out a gun and told me to walk back toward our car. As I was walking back toward the car I saw a man run across the road and fall in a ditch. Then I saw a red or maroon Chevrolet coming toward me at a high rate of speed. The car stopped and McGuffie was driving it. The man that had told me to walk back stopped beside McGuffie and McGuffie pointed his pistol at the man while I got into the car. We then sped off. McGuffie later told me that the man had told him that they had seen us burglarizing the house. McGuffie asked him 'are you sure' and they said yes. He said that in that case hit the gound [sic] and pulled out his pistol. Then he took one of the men's car and came and got me. We went home. I can't remember if it were a day or two later that me and another person that I am not going to mention robbed a supermarket on Fulton St. I abandoned the car at an apartment complex which was the car that I had stolen on Frick Road. Me and McGuffie kept on working together up until December when I met a man who had some real estate keys that which was keys to lock boxes. These are used to keep the keys of real estate customers homes. The lock boxes hung on the front door containing the homer owners keys. The keys had open all lock boxes on all homes. This is how I gained entry to the homes. I used these keys on approximately 50 burglaries. Then I heard through street talk that they were hunting me for the murder in Clute Texas. I got scared and threw away the keys on Hwy 290.

"When I knew that the Harris County Sheriff's Office were getting close to catching me I left and went to Robinson County, Hern [sic] Texas and was arrested there by the Sheriff. The next day Officers from Clute Texas and Officer Tywater from Harris County came down and talked to me, at which time they served a murder warrant from Bazoria [sic] County. After being brought back from Bazoria [sic] County, I deceided [sic] to cooperate with the Harris County officials.

"Officer Argo and Officer Pryer of Clute Texas talked to me and I told them that I wanted to go to Harris County and get my business straight. On Monday, January 31, 1977 Mr. Argo and Pryer brought me to Harris County and put me into the custody of Det. Tywater and he took me before a magistrate, Judge Pacitte were [sic] I was advised of my rights. I told Detective Tywater about the burglaries and robberies and car thefts and offered to show him the

locations and the way that I made entry and how I disposed of the property. I rode with Det. Tywater and Detective Price and pointed out the locations in North Harris County and in West Harris County that I had burglarized. I also explained how I had gained entry into the residence and told them who was implicated with me, in these burglaries. The officers copied addresses and spoke with the people. I beleived [sic] that there were about 75 burglaries I committed in Harris County and probable 30 more in the city of Houston. I stole approximately 30 cars and committed 3 or 4 armed robberies in Harris County.

"I disposed of the property through fences that I knew and dealt with. I gave Mr. Tywater the names of 2 or 3 fences but will not name them in this statement. Most of the property is gone and can never be recovered, I believe.

"I was not threatened, corhersed [sic] or made any deals and I made this statement strickly [sic] on my own with no advisement from anyone. I did not wish to have counsel by attorney and I am guilty of these crimes and I am admitting them."

## STATE'S MOTION FOR REHEARING

ODOM, Judge, concurring.

I concur in the decision to grant the state's motion for rehearing on the basis of records that were not before this Court on original consideration of this appeal, but which have now been presented by supplemental records, regarding appellant's failure to pursue his right to a defensive psychological expert witness in a timely and diligent fashion. By addressing that issue in those terms, however, the majority has not departed from its fundamental holding on original submission, in which this Court recognized the right of an indigent capital murder defendant to the appointment of an expert witness on the future conduct issue of Article 37.071, V.A.C.C.P. That right was acknowledged to rest on these considerations:

Those who face an accusation of being likely to commit criminal acts of violence that will constitute a continuing threat to society face a peculiarly unique charge with ominous consequences. In this jurisdiction the use of the expert opinion testimony of those in the behavioral sciences has frequently been resorted to by the prosecution, and this Court has consistently approved such use, often basing the sufficiency of the evidence to support a death-producing verdict on that evidence. See, e. g., *Franklin v. State* (5/24/78, # 57,348); *Chambers v. State,* Tex.Cr.App., 568 S.W.2d 313 (1978); *Hughes v. State,* Tex.Cr.App., 562 S.W.2d 857; *Shippy v. State,* Tex.Cr.App., 556 S.W.2d 246; *Granviel v. State,* Tex.Cr.App., 552 S.W.2d 107; *Battie v. State,* Tex.Cr.App., 551 S.W.2d 401; *Collins v. State,* Tex.Cr.App., 548 S.W.2d 368; *Moore v. State,* Tex.Cr.App., 542 S.W.2d 664; *Livingston v. State,* Tex.Cr.App., 542 S.W.2d 655; *Gholson* and *Ross v. State,* Tex.Cr.App., 542 S.W.2d 395; *Smith v. State,* Tex.Cr.App., 540 S.W.2d 693. Given the role such evidence has come to play, the unique character of the issue, the extreme consequences that rest on resolution of the issue, and the tremendous diversity of opinions on such matters within the field of experts that may qualify to give such evidence on the issue, it cannot be denied that for accused persons facing the possibility of death, expert behavioral witnesses for the defense are necessities, not luxuries.

If the scales of justice are to weigh equal regardless of wealth; if the hand of justice is to extend as far to those who cannot afford to hire an expert as to those who can; if the State is not to have exclusive access to experts; if the jury is to hear "all possible relevant information about the individual defendant whose fate it must determine," *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and not hear only those experts of the prosecutorial persuasion; if fairness and open inquiry are to characterize the judicial exploration of the accused's mental condition and possible future conduct: then the indigent capital murder defendant must have equal access to psychological or psychiatric expert opinion testimony from some expert of his rea-

sonable choosing, but not necessarily his first choice.

I concur.

ROBERTS and PHILLIPS, JJ., join in this concurrence.