**Affirmed as Modified and Opinion Filed August 12, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-23-00164-CR

**RASHAD SCHENCY KELLY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F20-76833-W**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Garcia
Opinion by Justice Partida-Kipness

Appellant Rashad Schency Kelly was convicted of murdering Lawrence
Guerra and sentenced to thirty years in prison. On appeal, Rashad contends the State
failed to establish a proper chain of custody for five items admitted into evidence. In
a single cross-issue, the State asks us to modify the judgment to include a deadly
weapon finding. We overrule Rashad's sole appellate issue, sustain the State's cross-
issue, and affirm the trial court's judgment as modified.

# BACKGROUND

In the early morning hours of October 26, 2020, Officer Brody Baggs of the Dallas Police Department (DPD) was dispatched to a stabbing call. When he arrived on scene, he went to the front door of the residence and made contact with Rhonda Guerra, the victim's mother, and Lawrence Guerra, the victim. According to Officer Baggs, Rhonda was very upset and was crying and screaming, and Lawrence was sitting on the floor inside the front door. Lawrence had a cut on his side, was sitting in a pool of blood, and was groaning. Rhonda told Officer Baggs she was sleeping and woke up when she heard a noise in the home. When she came out of her room, she discovered Rashad Kelly had stabbed Lawrence in Lawrence's bedroom. Rhonda reported Rashad was dressed in black, wearing a hoodie, and left the house in her GMC Yukon.

DPD Crime Scene Analyst Carmen Fletcher arrived on scene at about 2:00 a.m. She met with responding officers, took notes and photographs of the crime scene, diagramed the scene, and began to look for and collect evidence. In the kitchen, Fletcher noticed knives were missing from the knife block. She found two knives in the dishwasher and found a third knife in a bedroom tucked "partially inside of the comforter" on the bed. She noticed a lot of blood on the bedding and on the bed. Fletcher testified the knives she found in the dishwasher had the same markings as the knife found in the comforter. Fletcher believes it is possible the knife in the comforter would fit a slot in the knife block, but she did not test that theory

because she collected and bagged the knife as evidence. While on scene, Fletcher also collected swabs of possible blood and a box cutter located in the backyard. At trial, Fletcher identified State's Exhibit 27 as the knife she collected on the scene. She testified her name, badge number, and element number were written on the exhibit's property tag, and the tube inside included in her handwriting the same tag number and case number listed on the property tag.

Detective Theodore Gross of the DPD Homicide Unit was the on-call homicide detective on October 26, 2020, and was assigned to this case. While another detective wrote the search warrant and went to the crime scene, Detective Gross went to headquarters to interview the victim's mother. When he arrived at headquarters, Detective Gross knew from officers on the scene that Lawrence was the victim and Rashad was the suspect. He also had information regarding a tan GMC Yukon. During their interview, Rhonda provided Detective Gross with enough information to issue an arrest warrant for Rashad. When DPD activated the warrant, they also put out a state-wide be-on-the-lookout bulletin (BOLO) for the Yukon's license plate number and for Rashad in that Yukon.

Rashad was located that evening driving the Yukon in Wichita County, Texas. At 5:00 p.m., Wichita County Sheriff's Office Deputy Amanda Ward received a "check until officer satisfied" (COS) call for reckless driving concerning a tan GMC Yukon. The 911 caller said the vehicle was impeding traffic by driving very slowly on the highway and being unable to maintain a lane. Deputy Ward responded to the

dispatch, found the vehicle, and observed the Yukon driving very slowly on the highway. When she checked the vehicle's tag with dispatch, she discovered the registration was expired. She followed the Yukon for about fifteen minutes, during which the Yukon maintained its slow speed. Deputy Ward eventually activated her emergency lights and sirens and pulled the Yukon over. She made contact with the driver and identified him as Rashad Kelly. He told Deputy Ward he was driving from Irving and had left Irving about forty-five minutes before he was pulled over. He could not answer where he was headed. Irving is about two and a half hours away from where she pulled Rashad over. After getting his identification, Deputy Ward returned to her patrol unit and checked Rashad through dispatch using the driver's license number and plate registration. That is when she learned Rashad had a full extradition warrant for homicide out of Dallas County. She waited for back up officers to arrive and then completed a felony stop. Rashad was taken into custody without incident.

Deputy Ward testified Rashad was wearing grey sweatpants and a dark-colored hoodie at the time of his arrest. She identified State's Exhibit 24 as a photograph taken of Rashad after he was handcuffed and was starting to be escorted to her patrol unit. The photo shows Rashad wearing grey sweatpants and a dark-colored hoodie. After arresting Rashad, Deputy Ward secured the vehicle with evidence tape and had it towed to the Wichita County Law Enforcement Center. Deputy Ward then transported Rashad back to the Wichita County Sheriff's Office,

where he was given clothes to wear in custody. Deputy Ward took possession of the clothes he was wearing at the time of the arrest and placed the clothing inside paper evidence bags. She later turned those evidence bags over to DPD Detective Gross.

When Detective Gross learned Rashad had been apprehended, he and another detective drove to Wichita County to interview Rashad. When they arrived in Wichita County, they were notified the Yukon had been seized and placed in a barn for them. Detective Gross obtained and issued a search warrant for the Yukon. Texas Ranger[1] Jacob Weaver of the Texas Department of Public Safety Criminal Investigations Division processed the Yukon after receiving the search warrant from DPD.

Special Agent Weaver testified the Yukon was parked in an indoor garage bay at the Wichita County Law Enforcement Center. The Yukon was wrapped with crime scene tape and all of the doors had been sealed with evidence tape. This told Special Agent Weaver "that nobody had been in that vehicle since law enforcement had come in contact with it and it was secure and its contents were secure." He and the other Texas Ranger assisting him both wore gloves before opening the Yukon's doors and while processing the vehicle. They found and seized five pieces of evidence in the Yukon: a pair of black pants in the back seat of the car, a glove in the console next to the driver's seat, another glove with a red stain on it found in the

---

[1] At the time of trial, Weaver was a Special Agent with Texas DPS. We will refer to him as Special Agent Weaver.

console area, a cell phone found in the console, and a receipt found in the driver's door panel. He tested the red stain on the second glove using Hemastix to determine the presence of blood. The test strip turned blue indicating a positive presumptive test for the presence of blood.

At trial, Special Agent Weaver identified State's Exhibits 33 through 40 as photos showing the exterior and interior of the vehicle, the items located in and seized from the vehicle, and the Hemastix strip showing a blue, positive result. He testified that he seized the gloves and the black pants and packaged them to send to the lab. Special Agent Weaver also confirmed he was given the items of clothing removed from Rashad when he was arrested. He identified State's Exhibits 29, 30A, 30B, and 31 respectively as a hoodie given to him by the Wichita County Sheriff's office after he finished processing the vehicle, the black pants he removed from the vehicle, and the left and right gloves that were removed from the console and console area of the vehicle. He testified it was his understanding Rashad was wearing the hoodie at the time of the arrest. After sealing the items and marking the seals, Special Agent Weaver gave the items to Detective Gross.

Detective Gross testified he took possession of the items seized from the vehicle as well as the items that were on Rashad's person when he was arrested. He also obtained a buccal swab from Rashad and deposited it into a secured bag. He placed the sealed items in a locked container in the trunk of his car, drove back to Dallas, and delivered the sealed items to the Southwestern Institute of Forensic

Sciences (SWIFS) for DNA testing and analysis to compare the suspect's DNA with DNA found on other pieces of evidence and the victim. He also delivered the knife to SWIFS for DNA analysis and testing. Detective Gross described the knife as an approximately eight-inch long chef's knife. At trial, he identified State's Exhibit 22 as a photo of the knife found in Lawrence's bed and State's Exhibit 27 as the same knife shown in State's Exhibit 22 and the same knife he delivered to SWIFS.

He also identified State's Exhibit 29 as the hoodie Rashad was wearing at the time of the arrest and testified the exhibit matches the hoodie Rashad is seen wearing in State's Exhibit 24, the photo taken at the time of his arrest. Detective Gross also identified State's Exhibits 30A, 30B, and 31 respectively as the gloves and black pants found in the Yukon. He further confirmed the evidence bags marked as State's Exhibits 29, 30A, 30B, and 31 were the same bags the items were in when he received them in Wichita County and delivered them to SWIFS. He also explained the different types of tape and notations on the evidence bags:

> A. . . . So when the troopers had secured the evidence, they placed the white tape on it. Once the crime lab gained access to it, they cut a hole into it and they use the red tape that's seen on the bags.
>
> Q. And there is a case number and a tag number written on the bag?
>
> A. Right.
>
> Q. Is that yours or was that Wichita Falls'[s] or is that the crime lab?
>
> A. That's ours, yes.
>
> Q. And there's this other writing that begins with IFS --
>
> A. That's going to belong to the crime lab.

Courtney Ferreira, a forensic biologist at SWIFS, conducted the DNA testing in this case. She was the State's last witness during the guilt-innocence phase of trial. Ferreira testified she performed DNA analysis on the following:

- Blood standard from the victim, Lawrence Guerra.

- Buccal swab standard from Rashad Kelly

- DNA samples from a left shoe, left glove, right glove, sweatpants, a hoodie, pants, a shirt, and a knife.

At trial, Ferreira identified State's Exhibits 41 through 44 as the serologist's sketches of and notes regarding the left glove with the red stain, the hoodie, the pants, and the knife, and State's Exhibit 45 as her own report. Ferreira explained the sketches and notes on State's Exhibits 41 through 44 were from the serologist who would have performed the screening for biological fluids and taken any samples. State's Exhibits 41 through 45 were admitted without objection.

The State then showed State's Exhibits 27, 29, 30A, 30B, and 31 to Ferreira. She identified those exhibits respectively as the knife, the hoodie, the left glove, the right glove, and the black pants. She explained each exhibit included SWIFS's unique identifying number and the initials of the analysts who would have opened the evidence bags and collected the samples. When the State moved to admit the exhibits, Rashad's counsel objected:

> Your Honor, and we would object. We don't believe a proper predicate has been laid. More specifically, there's no testimony before the Court as to who collected these items, whether they were inside the vehicle prior to Deputy Weaver getting the warrant. So we don't know who

collected them, whether the Wichita County Sheriff's people collected them. There's no chain of custody.

And furthermore, under Melinda Diaz[2], the analyst here who took the samples that she's going to testify about has not been made available to testify of taking the samples and for cross-examination.

The trial court overruled the objection, admitted the exhibits, and granted the defense a running objection to those items. Ferreira then identified each item and the court published them to the jury.

Ferreira also described the results of the DNA analysis conducted on the items. She told the jury a single source profile with one contributor matching Lawrence's DNA profile was found on the sample taken from the left-hand glove, the sample taken from the black pants, two samples taken from the knife's handle, and the sample taken from the bottom of the knife's blade. Because these were all single source profiles, Rashad was excluded as being a potential contributor to those samples. However, analysis of the sample from the hoodie showed a mixture of two contributors. Both Lawrence and Rashad were included as potential contributors to the mixture tested from the hoodie. Finally, a sample taken from the back edge of

---

[2] In Rashad's appellate brief, he states Melinda Diaz is the SWIFS serologist "who examined the items for possible biological fluids and took samples from the items." Nothing in the record supports Rashad's contention the serologist was named Melinda Diaz, and two of the serologist's diagrams and notes are signed by analysist Ola Moussa. The State asserts the reference to "Melinda Diaz" was a reference to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325-26 (2009), which held the defendant's right of confrontation was violated by the admission of affidavits by non-testifying analysts who attested the substance tested was cocaine.

The identity of the serologist is irrelevant to our analysis, and Rashad does not assert a Confrontation Clause argument on appeal. We, therefore, make no determination of trial counsel's meaning when he referenced "Melinda Diaz" in his objection.

the knife near the handle produced a low level, single source sample in which both Lawrence and Rashad were included as potential contributors. Ferreira testified those results were not statistically significant due to the low-level of genetic information obtained from that sample. In sum, Lawrence was included as a contributor or potential contributor of the DNA found in samples taken from the hoodie, the left-hand glove, the black pants, the knife's handle, and the bottom of the knife's blade. Rashad's counsel lodged no objections to Ferreira's testimony regarding the results of the DNA testing.

The jury convicted Rashad of murder and sentenced him to thirty years in prison. The trial court overruled Rashad's motion for new trial, and this appeal followed.

## STANDARD OF REVIEW

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Beham v. State,* 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Beham*, 559 S.W.3d at 478; *Gonzalez*, 544 S.W.3d at 370.

## APPLICABLE LAW

A chain of custody is conclusively proven if an officer is able to identify that the officer seized the item of physical evidence, put an identification mark on it, placed it in the property room, and then retrieved the item being offered on the day

of trial. *Jolliff v. State*, No. 05-21-01159-CR, 2023 WL 2926459, at *2 (Tex. App.—Dallas Apr. 13, 2023, no pet.) (mem. op., not designated for publication) (citing cases). A chain of custody is sufficiently authenticated when the State establishes the beginning and the end of the chain, particularly when the chain ends at a laboratory. *Id.*; *Simmons v. State*, No. 05-11-01267-CR, 2013 WL 1614114, at *6 (Tex. App.—Dallas Feb. 20, 2013) (mem. op., not designated for publication) (citing *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd)). Absent proof of tampering, most problems with the chain of custody do not affect the admissibility of evidence, but rather go to the weight of the evidence. *Jolliff*, 2023 WL 2926459, at *3 (citing *Bird v. State*, 692 S.W.2d 65, 70 (Tex. Crim. App. 1985)). Here, Rashad made no allegation in the trial court that any of the objected-to items had been tampered with and makes no such argument in his brief before this Court. Because appellant did not raise the issue of tampering, any issues with the chain of custody go to the weight of the evidence, not its admissibility. *See id.*

Further, Texas does not require a showing of chain of custody for admission of evidence that is readily identifiable. *Hammett v. State*, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979). "The State is not obligated to prove chain of custody on such items as clothing." *Belcher v. State*, 661 S.W.2d 230, 233 (Tex. App.—Houston [1st Dist.] 1983, pet. ref'd) (citing *Hackbarth v. State*, 617 S.W.2d 944, 947 (Tex. Crim. App. [Panel Op.] 1981)). A chain of custody showing is required when scientific

–11–

tests or analyses are necessary to distinguish the evidence's relevant characteristics. *Jolliff*, 2023 WL 2926459, at *2; *Davis v. State*, 831 S.W.2d 426, 443 (Tex. App.—Austin 1992, pet. ref'd) (first citing *Hammett*, 578 S.W.2d at 708; and then citing *Edlund v. State*, 677 S.W.2d 204, 210 (Tex. App.—Houston [1st Dist.] 1984, no pet.)). The chain-of-custody requirement generally applies to indistinguishable objects, such as drug samples or test results. *Davis v. State*, 992 S.W.2d 8, 10–11 (Tex. App.—Houston [1st Dist.] 1996, no pet.) ("If the proponent is not able to identify the physical evidence through distinctive markings or the like, or if the evidence is fungible, as are drugs or test results, a chain of custody was required."); *George v. State*, No. 02-23-00261-CR, 2024 WL 2971678, at *2 (Tex. App.—Fort Worth June 13, 2024, no pet. h.) (mem. op., not designated for publication) (quoting *Davis* and collecting cases). Ultimately, the trial court must decide "whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

## ANALYSIS

In a single issue, Rashad challenges the trial court's admission of the following pieces of evidence:

1. State's Exhibit 27 – the knife that was recovered from the bed at the crime scene;

2. State's Exhibit 29 – the dark hoodie appellant was wearing at the time of his arrest in Wichita County;

3.      State's Exhibit 30A – the left-hand glove found in the console of the Yukon;

4.      State's Exhibit 30B – the right-hand glove found in the console area of the Yukon; and

5.      State's Exhibit 31 – the pair of black pants found in the back seat of the Yukon.

The State offered these items into evidence at trial during the testimony of the State's final witness, forensic biologist Courtney Ferreira. Rashad's counsel lodged the following objection to the admission of those items:

> Your Honor, and we would object. We don't believe a proper predicate has been laid. More specifically, there's no testimony before the Court as to who collected these items, whether they were inside the vehicle prior to Deputy Weaver getting the warrant. So we don't know who collected them, whether the Wichita County Sheriff's people collected them. There's no chain of custody.
>
> And furthermore, under Melinda Diaz, the analyst here who took the samples that she's going to testify about has not been made available to testify of taking the samples and for cross-examination.

The trial court overruled the objection and admitted the exhibits. On appeal, Rashad notes the SWIFS serologist who took the samples from the items did not testify at trial. Rashad maintains the State failed to prove the chain of custody of those exhibits because "[n]o testimony was given regarding what happened to the items after the DNA testing was completed and how the items arrived at court." We disagree.

The State was not required to show a chain of custody because each of these items was readily identifiable from photos and testimony. *See Jolliff*, 2023 WL 2926459, at *2 (showing of chain of custody is not required for admission of evidence that is readily identifiable). The knife, the hoodie, the gloves, and the black

–13–

pants are not items for which the State's witnesses required scientific tests or analyses to identify the items and their relevant characteristics. They are readily identifiable items for which no chain of custody showing is required.

Moreover, multiple witnesses identified and authenticated the exhibits at trial. Through that testimony the State established the beginning and the end of the chain of custody for each item.

### 1. State's Exhibit 27 – the knife

Crime scene analyst Cameron Fletcher testified she found the knife in the comforter at the crime scene, photographed it, collected it, bagged it, and wrote her name, badge number, and element number on the property tag for the knife. Fletcher identified State's Exhibit 27 as the same knife she collected from the comforter at the crime scene. Detective Gross identified State's Exhibit 27 as the same knife shown in the photo taken by Fletcher (State's Exhibit 22), and as the same knife he took to SWIFS. Finally, Ferreira identified State's Exhibit 27 as the knife that was tested pursuant to her report. She also testified three pieces of information were on the exhibit: (1) SWIFS's unique identifying number, (2) the analyst's initials who would have opened and collected the sample from the exhibit, and (3) the date the analyst handled the item.

### 2. State's Exhibit 29 – the hoodie

Deputy Ward, the arresting officer in Wichita County, testified she collected the clothing Rashad wore at the time of his arrest, placed the clothing into paper

evidence bags, sealed the bags, marked the seals, and later gave the sealed items to Detective Gross. She identified State's Exhibit 24 as a photo of Rashad at the time of his arrest wearing the hoodie in question. Detective Gross told the jury he placed the sealed items he received from Deputy Ward in a locked container in the trunk of his car, drove back to Dallas, and delivered the sealed items to SWIFs. He also identified State's Exhibit 29 as the hoodie Rashad is seen wearing in State's Exhibit 24. Detective Gross further testified the sealed bag containing the hoodie that he placed in his trunk and delivered to SWIFS was in the same bag he identified at trial as State's Exhibit 29. Finally, Ferreira identified State's Exhibit 29 as the hoodie that was tested at SWIFS. She also testified the following information was on the exhibit: SWIFS's unique identifying number, the analyst's initials, and the date the analyst handled the item.

### 3. State's Exhibits 30A, 30B, and 31 – the left-hand glove, the right-hand glove, and the black pants

Special Agent Weaver processed the Yukon after Detective Gross issued the search warrant and asked DPS to process the vehicle. When he first saw the Yukon, it was wrapped with crime scene tape and the doors were sealed with evidence tape. He and another DPS officer who processed the vehicle wore gloves before opening the doors and while processing the vehicle. Special Agent Weaver identified State's Exhibits 30A, 30B, and 31 collectively as the left-hand glove, right-hand glove, and the black pants he collected from inside of the Yukon. He further testified that, after processing the vehicle and collecting the items, he sealed the items, marked the seals,

and gave the sealed bags to Detective Gross. During his testimony, Detective Gross confirmed he placed the sealed items in a locked container in the trunk of his car, drove back to Dallas, and delivered the sealed items to SWIFs. Detective Gross further testified the sealed items he placed in his trunk and delivered to SWIFS were in the same bags he identified at trial as State's Exhibits 30A, 30B, and 31. Finally, Ferreira identified State's Exhibits 30A, 30B, and 31 respectively as the left-hand glove, the right-hand glove, and the black pants tested at SWIFS. She also testified the following was written on each of those exhibits: SWIFS's unique identifying number for the specific item, the analyst's initials who opened and collected the sample from each item, and the date the analyst handled each item.

Under this record, we conclude the State established the beginning and the end of the chain of custody for each of the exhibits Rashad challenges on appeal. Although the State was not required to establish a chain of custody, the State sufficiently authenticated the chain of custody for State's Exhibits 27, 29, 30A, 30B, and 31. *See Jolliff*, 2023 WL 2926459, at *2. ("A chain of custody is sufficiently authenticated when the State establishes the beginning and the end of the chain, particularly when the chain ends at a laboratory.").

Rashad also contends the State failed to establish a chain of custody for the knife because Fletcher, the analyst who seized the knife at the crime scene, did not testify when and by whom the knife was taken to the DPD property room or SWIFS, and Detective Gross did not testify when and from where he retrieved the knife

before taking it to SWIFS. To preserve error for appellate review, a defendant must make his complaint to the trial court by a timely request, objection, or motion that states the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1)(A). Further, the complaint on appeal must comport with the objection at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Rashad did not object to the chain of custody for the knife on the grounds he now raises on appeal. Those grounds are therefore not preserved for our review. See *See Delgado v. State*, 635 S.W.3d 730, 749 (Tex. App.—Dallas 2021, pet. ref'd) (objections not made at trial were not preserved for appellate review).

Under this record, we conclude the trial court did not abuse its discretion by admitting State's Exhibits 27, 29, 30A, 30B, and 31. Finding no error, we overrule Rashad's sole appellate issue and do not address Rashad's argument that admission of the exhibits caused him substantial harm. TEX. R. APP. P. 47.1.

### THE STATE'S CROSS-ISSUE

In a single cross-issue, the State asks us to modify the judgment to correctly reflect an affirmative deadly weapon finding. We have the power to modify a judgment to speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc). To be effective, an affirmative deadly-weapon finding must be an "express"

determination. *Guthrie-Nail v. State*, 506 S.W.3d 1, 4 (Tex. Crim. App. 2015). As such, before modifying a judgment, we must determine whether the absence of the deadly weapon finding was a clerical error and not a conscious decision by the trial court. *Thorton v. State*, No. 05-16-00-CR, 2017 WL 1908629, at * 7 (Tex. App.— Dallas May 9, 2017, no pet.) (mem. op., not designated for publication).

Although a deadly weapon finding "may impact a sentence," it is not part of a "sentence" as contemplated by the legislature. *State v. Ross*, 953 S.W.2d 748, 751 (Tex. Crim. App. 1997). "While a deadly-weapon finding does affect a defendant's eligibility for probation and parole, it does not alter the range of punishment to which the defendant is subject, or the number of years assessed." *Ex parte Huskins*, 176 S.W.3d 818, 821 (Tex. Crim. App. 2005); *Quiroz v. State*, No. 03-19-00478-CR, 2021 WL 126777, at *8 (Tex. App.—Austin Jan. 14, 2021, no pet.) (mem. op., not designated for publication). "[A] trial court is not required to orally announce a deadly-weapon finding at sentencing if the allegation of use of a deadly weapon is clear from the face of the indictment." *Huskins*, 176 S.W.3d at 821.

Here, the trial judge did not orally refer to a deadly weapon finding on the record, and the judgment lists "N/A" under "Findings on Deadly Weapon." However, the indictment affirmatively referenced a deadly weapon in the murder charge:

> That RASHAD SCHENCY KELLY, hereinafter called Defendant, on or about the 26th day of October, 2020 in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly

–18–

cause the death of LAWRENCE GUERRA, an individual, hereinafter called deceased, by STABBING DECEASED WITH A KNIFE, a deadly weapon,

Although the jury did not answer a specific jury question concerning whether Rashad used a deadly weapon, the jury affirmatively found Rashad "guilty as charged in the Indictment." That finding is sufficient to authorize entry of a deadly-weapon finding. *Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016) (one way in which "a court can determine that the trier of fact actually made an affirmative finding of a deadly weapon" is when "the indictment specifically alleged a 'deadly weapon' was used (using the words 'deadly weapon') and the defendant was found guilty "as charged in the indictment;'").

Accordingly, we sustain the State's cross-issue and modify the judgment to include an affirmative deadly weapon finding. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009) (jury verdict finding defendant guilty "as included in the indictment" constitutes a finding the defendant used a deadly weapon when indictment alleges use of a deadly weapon); *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985) (if indictment by allegation specifically places the issue before the trier of fact, affirmative finding is de facto made when the defendant is found guilty "as charged in the indictment"); *see also* TEX. R. APP. P. 43.2(b); *Bigley*, 865 S.W.2d at 27; *Asberry*, 813 S.W.2d at 529.

## CONCLUSION

Under this record, we conclude the trial court did not abuse its discretion by admitting State's Exhibits 27, 29, 30A, 30B, and 31 into evidence. We also conclude the judgment should be modified to include a deadly weapon finding. Accordingly, we affirm the judgment as modified.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

230164F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

RASHAD SCHENCY KELLY,
Appellant

No. 05-23-00164-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F20-76833-W.
Opinion delivered by Justice Partida-
Kipness. Justices Pedersen, III and
Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to include an affirmative deadly weapon finding as follows:

We **DELETE** "N/A" under "Findings on Deadly Weapon" and **INSERT** "YES, A KNIFE" in its place under "Findings on Deadly Weapon[.]"

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 12th day of August 2024.